**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SCOTT MICHAEL FENNELL,     )
                                )
       Plaintiff         )
                                )     2:09cv714
       v.             )     **Electronic Filing**
                                )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                                )
       Defendant     )

## OPINION

### I.   INTRODUCTION

Scott Michael Fennell ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("the Act"). This matter comes before the Court on cross-motions for summary judgment. The record has been developed at the administrative level. For the following reasons, Plaintiff's motion will be granted in part and denied in part, defendant's motion will be denied, and the matter will be remanded with direction to grant benefits consistent with an onset date of May 12, 2006.

### II.   PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on April 26, 2005, claiming an inability to work as of July 23, 2002. (R. at 40).[1] Plaintiff initially was denied DIB on November 7, 2005. (R. at 60 - 63). A hearing was scheduled for February 6, 2007, and Plaintiff appeared and testified, represented by counsel. (R. at 787). A vocational expert, Karen Krull, also testified. (R. at 787). The Administrative Law Judge ("ALJ") issued his decision

---

[1]

    Citations to Doc. Nos. 9 - 9-3, the Record, *hereinafter*, "R. at __."

denying Plaintiff's application on April 13, 2007. (R. at 9 - 23). Plaintiff sought review of the ALJ's decision by the Appeals Council, which denied his request on April 29, 2009, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 5 - 7).

Plaintiff filed his Complaint on June 3, 2009. Defendant filed his Answer on January 22, 2010. Cross-motions for Summary Judgment followed.

### III. STATEMENT OF THE CASE

#### A. General Background

Plaintiff was born on April 3, 1972, and was thirty four years of age at the time of the administrative hearing. (R. at 40, 787). He is a high school graduate with an Emergency Medical Technician Certificate. (R. at 791). Plaintiff was working as a carpenter when he was involved in a rear-end automobile collision on July 23, 2002. (R. at 791). The collision caused injury to his neck. (R. at 792). At the time of the administrative hearing, Plaintiff was divorced, had a five year old son, and was living with his parents. (R. at 724, 796, 799, 801).

#### B. Treating Physicians

Plaintiff was examined by Anna Mathew, M.D., immediately after the accident on July 23, 2002. (R. at 459). He complained of pain on the left side of his neck which was radiating down his left shoulder. (R. at 459). Plaintiff felt a sharp, shooting pain with certain movements, and reported difficulty raising his left arm above his head and moving his neck. (R. at 459). He experienced no numbness, weakness, or tingling in his arms. (R. at 459). Dr. Mathew examined Plaintiff and found tenderness and muscle spasm on the left side of Plaintiff's neck. (R. at 459). Plaintiff's range of motion in his neck and left shoulder also were limited. (R. at 459). He was diagnosed with cervical strain status post whiplash injury. (R. at 460). Plaintiff was limited to light work, and was to avoid lifting more than 20 pounds, working above shoulder level, pushing or pulling, and hammering and sawing. (R. at 460).

Plaintiff's neck condition and pain worsened progressively over the next several visits with Dr. Mathew. (R. at 455 - 56, 458). On August 19, 2002, following magnetic resonance imaging ("MRI") of Plaintiff's neck, Dr. Mathew determined that Plaintiff had a disc herniation

between his C6 and C7 vertebrae. (R. at 453).  Plaintiff was ordered to stop working until evaluated by a neurosurgeon. (R. at 453).

Plaintiff underwent a cervical discectomy and interbody fusion at C6-C7. (R. at 451).  On October 4, 2002, at an examination with Dr. Mathew following the surgery, Plaintiff was found to be progressing well; his left arm pain was decreasing, his graft placement and alignment were good, and his incision site was healing well. (R. at 451).  However, on October 11, 2002, Plaintiff was seen by Dr. Mathew complaining of increasing neck pain, shooting pains in the shoulders, arms, and neck, and an inability to sleep due to pain. (R. at 450).  Dr. Mathew noted significant tenderness of the neck, muscle spasms, and marked limitation in range of motion. (R. at 450).

Plaintiff's increased pain and symptoms persisted over the next several visits with Dr. Mathew. (R. at 286, 442, 443, 446).  X-ray and MRI scans of Plaintiff's neck initially showed no abnormal results. (R. at 286, 442, 443, 446).  At a December 16, 2002 appointment, Dr. Mathew noted that Plaintiff's fusion had not taken; Plaintiff's neurosurgeon placed Plaintiff on a bone stimulator, but cautioned that he may require further surgery. (R. at 442).  Dr. Mathew noted that Plaintiff continued to experience significant pain and limited range of motion. (R. at 438 - 41). Plaintiff was limited to doing only sedentary work. (R. at 438 - 41).  Plaintiff relied increasingly on pain medication to cope with his physical condition. (R. at 438 - 41).

James H. Uselman, M.D., was Plaintiff's neurosurgeon and performed his discectomy and fusion on September 9, 2002. (R. at 178, 281, 668).  Following Plaintiff's surgery, testing conducted by Dr. Uselman indicated that the results of the operation were normal and there was no evidence of further herniation or nerve compression. (R. at 178).  Plaintiff's neck alignment was good, and Dr. Uselman described Plaintiff's MRI results as "quite good." (R. at 178).

Yet, at a December 5, 2002 visit with Dr. Uselman, it was determined that Plaintiff's fusion was not taking. (R. at 278).  Plaintiff was prescribed a bone stimulator to aid in the fusion of his C6 and C7 vertebrae. (R. at 278).  At a January 9, 2003 visit, Dr. Uselman noted that Plaintiff continued to complain of pain, and ordered additional testing and treatment at a pain clinic. (R. at 466).  By February 13, 2003, Plaintiff's neck was still giving him significant

difficulty, and a bone scan showed that Plaintiff's fusion had failed. (R. at 243). Plaintiff was scheduled for a revision surgery to fix the fusion. (R. at 243).

On March 7, 2003, Plaintiff underwent a revision surgery with Dr. Uselman. (R. at 474 - 76). The old plates and screws were removed, as was the first bone graft. (R. at 474 - 76). A new bone graft - taken from Plaintiff's hip as opposed to a donor - was placed at the fusion site, and a larger plate and longer screws were used to secure the C6 and C7 vertebrae. (R. at 474 - 76).

By April 10, 2003, Dr. Uselman noted that Plaintiff had healed well after the revision surgery, and his strength was good. (R. at 464). Plaintiff continued to report neck pain, and significant hip pain. (R. at 464). Plaintiff's arm pain had resolved. (R. at 464). X-rays of Plaintiff's neck were "quite good." (R. at 464).

Plaintiff had a final visit with Dr. Uselman on June 5, 2003. (R. at 463). Dr. Uselman noted that Plaintiff's hip pain had finally settled down, although his neck pain persisted. (R. at 463). Plaintiff reported that some pain occasionally radiated down his right arm. (R. at 463). With respect to diagnostic testing, imaging of Plaintiff's spine showed fusion. (R. at 463).

A functional capacity evaluation conducted by Plaintiff's physical and occupational therapists on August 1, 2003, indicated he physically was capable of performing light work, lifting up to twenty pounds occasionally and ten pounds frequently, and using a negligible amount of force constantly to move objects. (R. at 217 - 20, 494 - 505).

Plaintiff began seeing neurologist Antoin Munirji, M.D., on July 10, 2003, for neck pain and headaches. (R. at 358). Plaintiff was provided with a prescription for Vicodin for pain, and was advised to participate in occupational therapy because he would not be capable of returning to his former work. (R. at 358). On July 28, 2003, Dr. Munirji released Plaintiff for "light duty" work. (R. at 221). Electromyography ("EMG") nerve conduction testing conducted by Dr. Munirji on July 18, 2003, was "essentially normal," but Dr. Munirji opined that because such testing cannot measure the smallest nerve fibers conveying pain, it was still possible that mild

radiculopathy,[2] myofascial pain syndrome,[3] or other causes of pain and numbness could exist. (R. at 648). Accordingly, Plaintiff's release for work limited him to: one to four hours standing/walking; three to five hours sitting; and no lifting over fourteen pounds. (R. at 221).

According to Dr. Munirji's treatment notes, Plaintiff's condition remained relatively unchanged through March 5, 2004 - although Plaintiff began to mention that he was feeling depressed on September 19, 2003. (R. at 632-43). However, on April 14, 2004 Dr. Munirji found that Plaintiff was suffering from severe pain, ordered an MRI of Plaintiff's neck and contemplated referring Plaintiff to a pain clinic depending upon the MRI findings. (R. at 630-31). Plaintiff was diagnosed with cervical radiculopathy. (R. at 630).

On May 13, 2004, Dr. Munirji noted Plaintiff continued to suffer from severe neck pain, and diagnosed Plaintiff with cervical radiculopathy and C4-C5 disc protrusion after reviewing the most recent cervical MRI. (R. at 626-27). Dr. Munirji also noted Plaintiff's continuing depression. (R. at 626-27). EMG testing was again performed on Plaintiff on May 18, 2004, and as before, revealed "essentially normal" results. (R. at 624). Also, as before, Dr. Munirji opined that because such testing cannot measure the smallest nerve fibers conveying pain, it was still possible that radiculopathy, myofascial pain syndrome, or other causes of pain and numbness could exist. (R. at 624).

---

[2]

"Radiculopathy refers to any disease that affects the spinal nerve roots. A herniated disc is one cause of radiculopathy." *MedlinePlus, U.S. National Library of Medicine/ National Institutes of Health*, http://www.nlm.nih. gov/medlineplus/ency/article/000442.htm (last visited September 29, 2010).

[3]

"Myofascial pain syndrome is a chronic form of muscle pain. The pain . . . centers around sensitive points in your muscles called trigger points. The trigger points can be painful when touched . . . [and] pain can spread throughout the affected muscle. Nearly everyone experiences muscle pain from time to time that generally resolves in a few days. But people with myofascial pain syndrome have muscle pain that persists or worsens. Myofascial pain caused by trigger points has been linked to many types of pain, including headaches, jaw pain, neck pain, low back pain, pelvic pain, and arm and leg pain." *MayoClinic.com*, http://www.mayoclinic.com/health/myofascial -pain-syndrome/DS01042 (last visited September 29, 2010).

5

By June 11, 2004, Plaintiff's worsened symptoms led Dr. Munirji to conclude that Plaintiff was completely disabled. (R. at 620). Plaintiff was diagnosed as suffering from cervical radiculopathy. (R. at 620-21). He was referred to neurosurgeon Dr. Bookwalter to determine if surgical intervention could improve his pain. (R. at 620). On July 12, 2004, Plaintiff also was referred to Dr. Hsu for rehabilitation and pain management. (R. at 618). Dr. Munirji indicated that Plaintiff was then referred for a diagnostic psychological evaluation by Dr. Hsu. (R. at 617). At a September 7, 2004 examination, Dr. Munirji concluded that other than offering pain medication, there was nothing more that could be done to treat Plaintiff. (R. at 614). Plaintiff continued to suffer significant neck pain and was diagnosed with cervical injury status post surgery. (R. at 614-15). By October 7, 2004, Dr. Munirji concluded that Plaintiff had reached maximum medical improvement, and noted that he suffered from chronic cervical radiculopathy. (R. at 612).

Dr. Munirji observed relatively few changes in Plaintiff's condition through June 10, 2005, and continued to prescribe pain medication for severe neck pain. (R. at 592 - 612). At the final June 10 appointment, Dr. Munirji considered Plaintiff's neck surgeries to have been failures, and opined that Plaintiff now suffered from cervical injury status post surgery. (R. at 592-95). Plaintiff also continued to exhibit depression. (R. at 592). Plaintiff was continued on pain medications, and was again considered to have reached maximum medical improvement. (R. at 592). Dr. Munirji stated that Plaintiff could not be expected to work on a regular basis because of his symptoms, and despite good strength. (R. at 592).

Neurosurgeon J. William Bookwalter, M.D., examined Plaintiff on May 18, 2004, following a referral from Dr. Munirji. (R. at 176). He noted that Plaintiff's range of motion in the neck was severely limited. (R. at 176). Upon review of an MRI, Dr. Bookwalter observed some post-operative changes at Plaintiff's fusion site. (R. at 176). A small herniation was noted at the C4-C5 level. (R. at 176). Spasm in the neck was also considered to be a cause of discomfort and numbness in Plaintiff's extremities. (R. at 176). Dr. Bookwalter recommended Plaintiff undergo an EMG, myelogram, and computed tomography ("CT") scan. (R. at 176).

On May 24, 2004, following the recommended studies, Dr. Bookwalter confirmed

bulging of the disc at the C4-C5 level, as well as some mild degenerative changes at the fusion site. (R. at 622). Dr. Bookwalter did not believe surgery would help Plaintiff's condition. (R. at 622). He believed that Dr. Hsu may be able to help rehabilitate Plaintiff. (R. at 622). In the meantime, Dr. Bookwalter recommended maintaining Plaintiff on total disability. (R. at 622).

Plaintiff began seeing Gin Ming Hsu, M.D. - board certified in physical medicine and rehabilitation, pain management, and spinal cord injury medicine - on June 15, 2004. (R. at 668). Plaintiff described his pain to Dr. Hsu as constant aching and stabbing pain, occasionally radiating down the arms. (R. at 668). Plaintiff also claimed that he suffered from frequent headaches, and his combined pains made sleeping difficult. (R. at 668). Physical therapy had provided Plaintiff with no relief. (R. at 668). Dr. Hsu found Plaintiff in moderate discomfort with tenderness in the neck and lower cervical spine. (R. at 669). Plaintiff's neck had extremely limited range of motion. (R. at 669). His upper extremity strength was five out of five. (R. at 669). Plaintiff's reflexes and sensation in his upper extremities were grossly intact and he had a full range of motion. (R. at 669).

Plaintiff was diagnosed as suffering chronic neck pain with a history of herniated disc at C6-C7 status post surgery, radiculopathy, myofascial pain, and enthesopathy.[4] (R. at 669). Dr. Hsu recommended pain medications, physical therapy, and cortisone injections. (R. at 669). Plaintiff also was to begin seeing Dr. Diliscia for psychological treatment and support. (R. at 669). Plaintiff's condition remained largely the same through further visitations with Dr. Hsu. (R. at 654 - 57, 112 - 13, 132 - 42). Plaintiff was regularly noted as visiting Dr. Diliscia for his psychological issues. (R. at 654 - 57, 112 - 13, 132 - 42).

Plaintiff also was referred to board certified pain management specialist Alfred S. Tung, M.D., by Dr. Hsu, for additional treatment. (R. at 127-28). Dr. Tung examined Plaintiff on August 3, 2004. (R. at 127-28). He noted that a recent CT myelogram showed scarring at the C6-

---

[4]

Enthesopathy is "any disease that affects the attachment of tendons or ligaments to bone. Enthesopathies can result from infammation associated with conditions including . . . ankylosing spondylitis." *Taber's Cyclopedic Medical Dictionary* 717 (20th ed. 2005). Spondylitis is "inflammation of one or more vertebrae." *Id.* at 2053.

C7 level of Plaintiff's spine, worsening disc bulging at the C4-C5 level, and multi-level degenerative changes. (R. at 127). It was noted that, for the most part, prior treatments for Plaintiff's pain were ineffective. (R. at 127). A past history of depression also was noted. (R. at 127). Dr. Tung observed that Plaintiff was anxious and depressed. (R. at 128). Though Plaintiff's deep tendon reflexes were normal, his range of motion in the cervical spine was limited, he had hypesthesia[5] around the palmer surface of his left hand, and tenderness over his C5-6-7-T1 spine and left C4-5-6 paravertebral area. (R. at 128). Pain around Plaintiff's right anterior/superior iliac spine and scar area also were observed. (R. at 128). Plaintiff was diagnosed with cervical and left upper extremity pain status post surgery, disc herniation, cervical radiculitis, cervical sprain, myofascial syndrome, and meralgia paresthetica.[6] (R. at 128). Dr. Tung provided Plaintiff with nerve blocks and injections which provided good relief to his arm, but only slight relief for deep cervical pain. (R. at 128).

On April 12, 2005, Plaintiff met with Dr. Hsu and stated that he thought he was becoming addicted to his pain medication and the addiction was negatively affecting his mood. (R. at 654). Dr. Hsu recommended reducing the use of pain medication. (R. at 654). Over the course of treatment with Dr. Hsu, Plaintiff continued to complain of fear of becoming addicted to pain medication. (R. at 650). By May 24, 2005, Plaintiff's pain was reported to have increased substantially. (R. at 652).

At his final recorded visitation with Dr. Hsu on June 29, 2005, Plaintiff's neck pain and limited range of motion had not improved. (R. at 650). Further, Plaintiff's psychological state had deteriorated significantly. (R. at 650-51). Dr. Hsu felt that Plaintiff was struggling with opioid dependence and addiction. (R. at 650-51). Plaintiff exhibited signs of increased

---

[5]

Hypesthesia is "a lessened sensibility in touch." *Taber's Cyclopedic Medical Dictionary* 1045 (20th ed. 2005).

[6]

Meralgia paresthetica is "pain and hyperesthesia on the outer femoral surface from lesion or disease of the lateral cutaneous nerve of the thigh." *Taber's Cyclopedic Medical Dictionary* 1343 (20th ed. 2005).

depression and anxiety. (R. at 650-51).  He reported nervousness and suicidal thoughts. (R. at 650-51).  Dr. Hsu recommended detox and further psychiatric evaluation. (R. at 650-51). Plaintiff was having difficulty receiving this care because of a lack of insurance coverage. (R. at 650-51).

Dr. Hsu summarized Plaintiff's treatment history on May 12, 2006. (R. at 747).  He opined that despite Plaintiff's earlier normal laboratory and diagnostic testing results, Plaintiff was in chronic pain and was extremely limited in terms of sitting, standing, walking, and lifting. (R. at 749).  Injections and physical therapy were not helpful. (R. at 748).  Opioids provided some relief, but created an addiction. (R. at 748).  Plaintiff also was found to suffer significant psychological disturbance. (R. at 748).  Plaintiff's psychological distress emanated from his constant physical pain, inability to work, marital discord, and drug addiction. (R. at 748). Plaintiff had been prescribed Lyrica[7], Ambien[8], Trazadone[9], and Lexapro[10] to treat his depression.

---

[7]
Lyrica, also known as 'Pregablin,' "is used to relieve neuropathic pain (pain from damaged nerves) that can occur in your arms, hands, fingers, legs, feet, or toes . . . It works by decreasing the number of pain signals that are sent out by damaged nerves in the body." *PubMed Health, U.S. National Library of Medicine/National Institutes of Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327 (last visited September 29, 2010).

[8]
Ambien, also known as 'Zolpidem,' "is used to treat insomnia." *PubMed Health, U.S. National Library of Medicine/National Institutes of Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928 (last visited September 29, 2010).

[9]
Trazadone "is used to treat depression.  Trazadone is in a class of medications called serotonin modulators.  It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." *PubMed Health, U.S. National Library of Medicine/National Institutes of Health*, http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0000530 (last visited September 29, 2010).

[10]
Lexapro, also known as 'Escitalopram,' "is used to treat depression and generalized anxiety disorder.  Escitalopram is in a class of antidepressants called selective serotonin reuptake inhibitors.  It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." *PubMed Health, U.S. National Library of Medicine/National Institutes of Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000214 (last visited

(R. at 748).  He was noted as having attempted suicide during his treatment with  Dr. Hsu. (R. at 748).  Dr. Hsu diagnosed Plaintiff with chronic neck pain, upper extremity radicular syndrome, myofascial pain, history of opioid dependence with addiction, depression, insomnia, and suicidal ideation. (R. at 749).  Dr. Hsu concluded that Plaintiff was unable to work because of the length of time his pain had continued unabated, the inability to improve his symptoms, and the resultant psychological issues Plaintiff suffered. (R. at 749).

C. *Independent Evaluations*

Plaintiff was sent for an independent medical evaluation with Richard B. Kasdan, M.D., on January 5, 2004. (R. at 385).  Dr. Kasdan noted that Plaintiff had almost no range of motion in his neck, but was without palpable spasm. (R. at 385).  Plaintiff had a full range of shoulder motion and normal strength in his upper and lower extremities. (R. at 385 - 86).  There was no evidence of atrophy, and Plaintiff exhibited no pathological reflexes. (R. at 386).  Dr. Kasdan opined that Plaintiff's normal EMG study results weighed against significant nerve root irritation. (R. at 386).  He found Plaintiff to be capable of full-time light duty work. (R. at 386).

Plaintiff returned to Dr. Kasdan on October 5, 2004, for a second independent medical evaluation. (R. at 120).  Plaintiff reported to Dr. Kasdan that neither the host of medications prescribed to him, the cortisone injections, nor the physical therapy had provided any benefits. (R. at 120).  Plaintiff complained of constant neck pain that worsened with any type of movement. (R. at 120).  Dr. Kasdan remarked that MRI's showed Plaintiff's fusion to be in place. (R. at 120).  A CT scan showed normal cervical alignment, good fusion, and no significant disc herniation above or below the fusion site. (R. at 120).  Nerve conduction studies also provided normal results. (R. at 120).  Physical examination of Plaintiff showed that he had almost no neck motion, but that he had good range of arm and shoulder motion, normal strength, normal sensation, and normal reflexes. (R. at 120).  Dr. Kasdan believed that Plaintiff had reached maximum medical improvement, and that he was receiving too much pain medication. (R. at 120).  Dr. Kasdan opined that Plaintiff was capable of full-time light duty work, with a

September 29, 2010).

fifteen pound limit. (R. at 120).

Eric Bernstein, Psy.D., evaluated Plaintiff's potential mental disorders on August 22, 2005. (R. at 690 - 91). Dr. Bernstein found that Plaintiff suffered from anxiety, depression, and opioid addiction. (R. at 690). Plaintiff claimed he was often anxious, shaky, depressed, and weepy. (R. at 690). Dr. Bernstein found that Plaintiff had some difficulty performing the activities of daily living. (R. at 691). Dr. Bernstein also observed that Plaintiff had difficulty with social interaction. (R. at 691).

Dr. Bernstein made limitation findings with respect to Plaintiff's mental condition on September 30, 2005. (R. at 692 - 93). Plaintiff's ability to understand, remember, and carry out instructions was impacted by his mental condition. (R. at 692). Plaintiff had slight limitation in carrying out short, simple instructions, and understanding and remembering detailed instructions. (R. at 692). Plaintiff was moderately restricted in terms of carrying out detailed instructions and making judgments on simple work-related decisions. (R. at 692). Plaintiff was not otherwise limited, and was determined to be able to respond appropriately to supervision, co-workers, and work pressures. (R. at 692 - 93).

*D. Hospital Admissions*

On July 8, 2005, Plaintiff was admitted to Butler Memorial Hospital to be detoxed from his narcotic pain medications. (R. at 672). He remained at the hospital voluntarily for only a very short time. (R. at 672). He attended group therapy but refused to admit to being addicted to his medication - Plaintiff stated that he entered the hospital because his doctor wanted him to stop his pain medications. (R. at 672). Plaintiff left against medical advice on July 11, 2005. (R. at 672). The supervising doctor deemed Plaintiff stable, but recommended follow-up care. (R. at 673). Plaintiff was not responsive to the recommendations because he believed he was not an addict. (R. at 673). At the time of discharge, Plaintiff was alert and oriented with no suicidal or homicidal ideation. (R. at 673). Hospital staff noted Plaintiff's history of depression since age

sixteen. (R. at 674). Plaintiff was recorded as abusing Percocet,[11] Fentanyl[12] patches, and Flexeril[13] to a significant degree. (R. at 674). Plaintiff was noted as having a history of alcohol abuse, though he claimed that he no longer drank. (R. at 674). He was diagnosed with narcotic dependency, alcohol dependency, and major depressive disorder. (R. at 672). Plaintiff was assessed a Global Assessment of Functioning ("GAF") score of 45 - 60.[14] (R. at 675).

---

[11] Percocet, also known as 'Oxycodone,' "is used to relieve moderate to severe pain. Oxycodone is in a class of medications called opiate (narcotic) analgesics." *MedlinePlus, U.S. National Library of Medicine/ National Institutes of Health*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last visited September 29, 2010).

[12] Fentanyl patches "are used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications. Fentanyl skin patches are only used to treat people who are tolerant to narcotic pain medications because they have taken this type of medication for at least 1 week. Fentanyl is in a class of medications called opiate (narcotic) analgesics." *MedlinePlus, U.S. National Library of Medicine/ National Institutes of Health*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601202. html (last visited September 29, 2010).

[13] Flexeril, also known as 'Cyclobenzaprine,' "a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *MedlinePlus, U.S. National Library of Medicine/ National Institutes of Health*, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/ a682514.html (last visited September 29, 2010).

[14] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or

On June 2, 2006, Plaintiff was hospitalized at Forbes Regional Hospital following an attempted suicide. (R. at 743). State Police had picked up Plaintiff in the Cook Forest Area after he sliced his wrist. (R. at 743). He presented with affective symptoms consistent with depressive illness. (R. at 743). Plaintiff was interviewed and evaluated for the first twenty-four hours and placed on new psychiatric medications. (R. at 743). He was discharged June 12, 2006. (R. at 740). John F. Delaney, M.D., felt that Plaintiff's prognosis was good as long as he continued to take his prescribed medications and followed up with scheduled treatments. (R. at 741).

On June 26, 2006, Plaintiff went to the emergency room at Forbes Regional Hospital seeking relief from neck pain. (R. at 733). He was alert and oriented, but in acute distress. (R. at 734). Upon examination, Plaintiff was found to exhibit full range of motion in his upper and lower extremities, normal tactile and pain sensation, no evidence of muscular dystrophy, and was within normal limits in musculoskeletal tests. (R. at 734). Plaintiff was provided with pain medication, but was not a candidate for surgical intervention. (R. at 734). His diagnosis was chronic neck pain and degenerative joint disease. (R. at 735). Plaintiff was then admitted to Forbes Regional Hospital under the care of Dr. Delaney because of recurrent suicidal ideation. (R. at 732). Plaintiff had thoughts of cutting his wrists and hanging himself. (R. at 732). He had difficulty concentrating, was irritable, had feelings of hopelessness and helplessness, and suffered from anhedonia. (R. at 732). Plaintiff was abusing alcohol. (R. at 732). He was medicated and released on July 3, 2006, with instructions to follow Dr. Delaney's advice and follow-up with outpatient care. (R. at 732).

On July 9, 2006, Plaintiff was readmitted to the Forbes Regional Hospital because of continued suicidal ideation. (R. at 725). Plaintiff was drinking to excess, and was stressed about a recent separation with his wife. (R. at 725). He called requesting to be admitted a week earlier,

---

hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

but was denied admission because he was intoxicated and denied suicidal ideation. (R. at 725). At the time of admission, however, Plaintiff stated that he intended to hang himself. (R. at 725). He was medicated, and instructed to follow up with a psychiatrist upon his discharge on July 14, 2006. (R. at 725 - 26). Plaintiff was diagnosed by Dr. Delaney with major depressive disorder, recurrent,[15] and alcohol and opiate abuse. (R. at 725).

On June 26 and July 9 of 2006, Plaintiff was given a behavioral health assessment at Forbes Regional Hospital - where he had been admitted for psychological work-up. (R. at 721 -

---

[15]

A major depressive episode is identified by the presence of at least two weeks during which there is depressed mood or loss of interest or pleasure in nearly all activities. In addition, the individual must experience four symptoms from the following areas: (1) changes in appetite or weight, sleep, and psychomotor activity; (2) decreased energy; (3) feelings of worthlessness or guilt; (4) difficulty thinking, concentrating, or making decisions; or (5) recurrent thoughts of death, suicidal ideation plans or attempts. These symptoms must persist for most of the day, nearly every day, for two consecutive weeks or more and the entire episode must be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV") at 349-56. Appetite may be reduced or increased, and when appetite changes are severe, there may be significant loss or gain in weight. *Id*. Sleep disturbances are common, psychomotor changes occur to a significant degree and decreased energy, tiredness and fatigue are common. Id. Individuals frequently experience impaired ability to think, concentrate, or make decisions and appear to be easily distracted or suffering from memory difficulties. *Id*. at 350. Individuals suffering from major depressive episode frequently present with tearfulness, irritability, brooding, obsessive rumination, anxiety, phobias, excessive worry over physical health, and complaints of pain such as headaches, joint, abdominal or other pains. *Id*. at 352. While recovery or partial remission is accomplished with treatment in the majority of cases, up to ten percent of individuals suffering from the full criteria for the disorder will continue to meet it for two or more years, resulting in a diagnosis of chronic major depressive episodes. *Id*. at 354, 417.

The essential features of major depressive disorder is a clinical course characterized by major depressive episodes. This diagnosis is appropriate where the condition becomes recurrent and the severity of the episodes can be measured as mild, moderate, severe without psychotic features, or severe with psychotic features. *Id*. at 369-70. Severity is judged to be mild, moderate, or severe based on the number of criteria symptoms, the severity of those symptoms, and the degree of functional disability and distress. *Id*. at 412. The presence of either delusions or hallucinations, which are typically auditory, during a episode identify a severe disorder with psychotic features. *Id*. at 412. Hallucinations, when present, are usually transient and not elaborate and may involve voices that berate the person for shortcomings or sins. *Id*.

24, 728 -31). Plaintiff was diagnosed with bipolar disorder and major depressive disorder with severe psychotic features. (R. at 724, 731). In both assessments, Plaintiff was given a Global Assessment of Functioning ("GAF") score of 20. (R. at 724, 731).

### E. Administrative Hearing

Plaintiff's hearing before the ALJ was held on February 6, 2007. (R. at 787). Plaintiff testified that his greatest limitation was a steady aching pain in his neck. (R. at 792). He described his other neck-related symptoms such as sharp pains down his left arm and numbness in his hand, bad headaches, and muscle tightness due to too much movement. (R. at 794). Plaintiff testified that as of the hearing date, due to severe addiction and his doctors' refusal to continue prescriptions, it had been approximately a year and a half since he last took pain medication. (R. at 795). He only takes Motrin for pain. (R. at 795). Changes in ambient temperature, particularly cold weather, as well as excessive head movement, aggravate his pain. (R. at 795). He has some sort of pain every day. (R. at 803). His neck pain requires him to stop what he is doing and lie down several times a week, at times for most of the day. (R. at 799, 804). His neck pain also detrimentally affects his sleep as well, which in turn makes him groggy most of the day. (R. at 804 - 5).

Plaintiff stated that he still has hip pain from his bone graft and can only walk or stand for a few minutes. (R. at 800). He can lift about ten pounds. (R. at 800). The extent of Plaintiff's cooking is using the microwave to heat his food. (R. at 801). He tries to help his mother do dishes for a few minutes before he has to sit or lay down because of his pain. (R. at 801). Plaintiff testified that his mother has to carry his laundry basket because he is incapable of doing so himself. (R. at 801). Plaintiff does not attempt to do any chores around the house. (R. at 801). He does not read or draw, and he does not belong to any organizations. (R. at 802). His pain even prevents him from coloring with his son. (R. at 804). Plaintiff occasionally visits family, and several times a week is visited by a friend on his street. (R. at 802). Plaintiff has an active driver's license and occasionally drives. (R. at 794 - 95).

Plaintiff admitted to feeling depressed, particularly when his neck pain is bad. (R. at 793). His depression affects his motivation and appetite. (R. at 799). Plaintiff avoids social interaction

anywhere between a couple of hours a day to an entire day. (R. at 806). He also cries frequently. (R. at 799). He often has feelings of worthlessness and a desire not to live any longer. (R. at 807). Plaintiff is seeing a psychologist, Dr. Fedder, and a psychiatrist, Dr. Rechter, for his mental condition. (R. at 796). Plaintiff stopped seeing his therapists when his health insurance terminated following his divorce. (R. at 796). Plaintiff is covered by worker's compensation for his physical ailments. (R. at 797). Plaintiff testified that he saw a psychologist, Dr. Diliscia, for almost a year after his accident, as well. (R. at 798). He would like to continue to seek psychiatric treatment, but cannot afford it. (R. at 806).

Vocational expert Karen Krull was asked to assess whether a significant number of jobs in the national economy were available to a hypothetical person of Plaintiff's age, educational background, and work experience, and with the following limitations: the ability only to perform sedentary work, standing no more than three hours out of an eight hour day - a sit/stand at-will option; the ability to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally; the ability to perform simple, routine, repetitive tasks not performed in a fast-paced environment; and, the ability to perform work involving only simple, work-related decisions, with no interaction with the public, and only occasional interaction with supervisors and co-workers. (R. at 809).

Ms. Krull testified that jobs were available. (R. at 809). Such an individual could work as an "alarm monitor," of which there were 75,000 positions nationally; and as a "hand packer," of which there were 50,000 positions nationally. (R. at 810). The ALJ asked if jobs would be available if an additional limitation involving the inability to stay on-task for twenty percent of each workday were considered. (R. at 810). Ms. Krull indicated no jobs would be available to such a person. (R. at 810). Plaintiff's attorney asked if some modest degree of concentration and some neck movement would be involved in the jobs described, and Ms. Krull responded affirmatively. (R. at 811).

*F. Eligibility for Benefits*

In his decision dated April 13, 2007, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work, with a sit/stand option at will. (R. at 14 - 22).

Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 14 - 22). Plaintiff was limited to simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few changes in the workplace. (R. at 14 - 22). In addition, he could have no interaction with the general public and only occasional interaction with supervisors and coworkers. (R. at 14 - 22). Accordingly, the ALJ determined that Plaintiff was not entitled to DIB under the Act. (R. at 23).

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[16] and 1383(c)(3).[17]  Section 405(g) permits a district court to review the transcripts and records upon which the determination of the Commissioner is based.

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g);  *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.

---

[16]

Section 405(g) provides in pertinent part:
> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[17]

Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). In other words, as long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986); *see also Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is

18

not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted); *see also* 20 C.F.R. §404.1520.  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision.  In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law.  That rule is to the effect that a reviewing court, in dealing

> with a determination or judgment which an administrative agency alone is
> authorized to make, must judge the propriety of such action solely by the grounds
> invoked by the agency. If those grounds are inadequate or improper, the court is
> powerless to affirm the administrative action by substituting what it considers to
> be a more adequate or proper basis. To do so would propel the court into the
> domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has

recognized the applicability of this rule in the Social Security disability context. *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four

corners of the ALJ's decision.

## V.    DISCUSSION

Plaintiff alleges the ALJ committed error on several levels. He argues that the ALJ

should have recognized his entitlement to DIB at both Step 3 and Step 5 of the disability analysis.

Specifically, had the ALJ properly considered the opinions of Plaintiff's treating physicians and

Plaintiff's subjective complaints, Plaintiff clearly would have satisfied the requisite criteria.

(Doc. No. 12 at 20 - 24). As support, Plaintiff specifically cites to evidence submitted for the

first time[18] to the Appeals Council and/or to this Court. (*Id.* at 9 - 12).

In response, Defendant counters that the ALJ acknowledged and accounted for all

evidence presented to him and the ALJ's determination was supported by substantial evidence.

(Doc. No. 14 at 11 - 19). Defendant also argues that because the ALJ and Appeals Council did

not consider Plaintiff's new evidence, this Court cannot consider such evidence when

determining whether the ALJ's decision was supported by substantial evidence. (*Id.*).

With respect to new evidence, a claimant may submit such evidence to the Appeals

Council for consideration so long as it is material to the period of alleged disability under

consideration at the hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. §

404.970(b). If the new evidence meets the requirements for review, the Appeals Council can

evaluate the new evidence with the prior evidence as a whole to determine if the ALJ's decision

---

[18]    R. at 756 - 789; Doc. No. 12-1.

was supported by substantial evidence. *Id.* However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id.*

Where the Appeals Council denies review, the ALJ's determination becomes final. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports the ALJ's determination. *Id.* A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, *upon the pleadings and transcript of record*, a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d. Cir. 1991) ("Because [the] evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence'")). A district court cannot, therefore, directly consider new evidence, but instead can remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request and showing. *Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id.* at 594. First, the new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Second, the new evidence must also be "material," in that: it is relevant to the time period and physical impairment(s) under consideration; it is probative; and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id.* Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id.* The court demands these three requirements be satisfied to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834). These requirements seek to assure that all material evidence is presented to the ALJ as soon as possible. *Id.* at 594-95.

In the present case, Plaintiff's new evidence was not considered by the Appeals Council because it declined to review Plaintiff's case. As such, the new evidence is not properly considered as part of the record, because the decision below was not made in conjunction with it. *Matthews*, 239 F.3d at 594. The Court will not review said evidence, and it will not inform its decision in this case. Further, Plaintiff has failed to make a showing supporting remand in accordance with the requirements of *Szuback*, 745 F.2d at 833. As a result, this Court cannot justify remanding the case to the ALJ for reconsideration of his opinion within the context of Plaintiff's new evidence.

Even without this new evidence, Plaintiff still contends that had the ALJ properly evaluated the opinions of his treating physicians and his subjective complaints, he would be entitled to DIB. (Docket No. 12 at 20 - 24). Defendant argues that the disability determination was the province of the ALJ alone, and the ALJ is entitled to deference when making credibility and weight determinations respecting physician opinions and subjective complaints. (Docket No. 14 at 11 - 24).

The ALJ erred in discounting the treating and consulting physicians' opinions and assessments as they relate to the later period of time reflected in the record. While the testing and treatment records during and shortly after plaintiff's surgeries do provide substantial evidence to support the ALJ's determination in so far as it indicated that plaintiff could perform a limited range of sedentary work at and around that time, the portions of record relied upon by the ALJ neither address nor provide meaningful insight into plaintiff's limitations and abilities during the later potion of time encompassed within plaintiff's claim. Furthermore, when viewed under the applicable standards, the medical records, opinions and assessments produced or rendered during that later period only provide substantial evidence in support of plaintiff's claim that he is disabled under the Act.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422,

429 (3d Cir. 1999)); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008) (a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time."); *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987); *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. *Gordils v. Secretary of Health and Human Services*, 921 F.3d 327, 328 (1st Cir. 1990) (citing *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was the only medical assessment on point and corroborated by other evidence). Similarly, examining physicians' reports that rest on objective clinical test results may be entitled to significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

The record in the present case shows a significant treatment history with Drs. Hsu and Munirji. Over a period of nearly two years, Dr. Munirji noted Plaintiff's steadily declining physical condition based upon objective medical observations and tests and Plaintiff's subjective complaints. Dr. Munirji sent Plaintiff to be examined by Dr. Bookwalter. Dr. Bookwalter concluded that imaging studies of Plaintiff's spine showed degeneration at and around Plaintiff's fusion site. (R. at 176, 622). Following Dr. Bookwalter's examinations, Dr. Munirji concluded that outside of pain medications, no other treatments would provide Plaintiff with relief in light of his treatment history. (R. at 614-15).

Plaintiff was considered by Dr. Munirji to have reached his maximum medical improvement on October 7, 2004, and was diagnosed as suffering from chronic cervical radiculopathy. (R. at 612). Dr. Munirji continued to prescribe pain medication until his treatment of Plaintiff ended, but his diagnoses of Plaintiff's condition never substantially changed. Plaintiff's depression also was acknowledged throughout Dr. Munirji's treatment notes. As a result of his physical and psychological condition, and lack of improvement after over two years of treatment, Dr. Munirji - a neurologist - determined that Plaintiff's spinal surgeries were both failures and that Plaintiff could not be expected to work. (R. at 592).

Dr. Hsu – who was board certified in physical medicine and rehabilitation, pain management, and spinal cord injury medicine – treated Plaintiff for his neck pain for over a year. He treated Plaintiff with pain medications, physical therapy, and injections. Dr. Hsu noted over the course of his treatment that Plaintiff's neck condition did not improve. Plaintiff was diagnosed with chronic neck pain, radiculopathy, myofascial pain, and enthesopathy. (R. at 699). In addition, Dr. Hsu consistently noted Plaintiff's struggle with depression. At Plaintiff's first appointment with Dr. Hsu on June 15, 2004, it was recommended that Plaintiff seek psychological counseling with Dr. Diliscia. (R. at 699). Plaintiff visited Dr. Diliscia regularly throughout his treatment history with Dr. Hsu.

Dr. Hsu also recommended that Plaintiff see pain management specialist, Dr. Tung. Dr. Tung was board certified in pain management. He reviewed objective medical testing results and concluded Plaintiff had significant degeneration at and around the site of fusion. (R. at 127). He noted a recent CT myelogram showed scarring at the C6-C7 level of Plaintiff's spine, worsening disc bulging at the C4-C5 level, and multi-level degenerative changes. Id. Plaintiff's depressed state also was readily observed by Dr. Tung. (R. at 127). Dr. Tung recognized that Plaintiff's pain generally had not responded well to previous therapy, and even the nerve blocks and injections given by Dr. Tung produced little relief for plaintiff's neck pain. (R. at 127-28).

By his last visit with Dr. Hsu in June of 2005, Plaintiff was found not only to have regressed, physically, but his emotional state had significantly deteriorated because of his pain and resultant upheaval in his personal life. (R. at 650-51). Depression and suicidal thoughts were

24

prevalent. (R. at 650-51). Plaintiff's difficulty finding adequate psychological care due to lack of insurance was noted. (R. at 650-51). As with Dr. Bookwalter and Dr. Munirji, Dr. Hsu concluded that Plaintiff's psychological condition and physical condition - severely limiting his ability to sit, stand, walk, and lift - precluded him from holding gainful employment. (R. at 748-49).

Despite the above findings by the treating physicians who had observed Plaintiff over prolonged periods of time, the ALJ found Plaintiff was not disabled. The ALJ appeared to rely primarily upon the findings of Dr. Kasdan and Dr. Berstein.

While it is not expected that the ALJ's explanation match the rigor of the "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, when rejecting a treating physician's findings or according such findings less weight, the ALJ must be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. While the explanation need not reference every relevant treatment note in a voluminous medical record, the ALJ, as the factfinder, should consider and evaluate the medical evidence thoroughly. *Id.* In doing so the ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales,* 225 F.3d at 317 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Nor can he "substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *see also Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

The ALJ's reliance on Dr. Kasdan and Dr. Brstein's examinations to supply sufficient substantial evidence to displace the import of all other aspects of the medical evidence was misguided. Dr. Kasdan conducted brief consultative examinations on two days, January 5 and October 5 of 2004. These examinations occurred relatively early in the span of treatment contained in the record. With respect to Plaintiff's physical limitations, Dr. Kasdan's findings are inconsistent with the weight of the objective medical evidence on record, particularly as they relate to the later period of time under consideration. Based upon medical test results available at

the time, Dr. Kasdan concluded that Plaintiff's nerve conduction studies were normal. (R. at 120). He also found that medical imaging studies showed Plaintiff's fusion was in place, there was normal cervical alignment, there was good fusion, and there was no significant disc herniation. (R. at 120). As a result, Dr. Kasdan concluded Plaintiff was capable of full-time work, despite an inability to move his neck. (R. at 120).

A very different picture was noted by the treating physicians. On August 3, 2004, Dr. Tung reviewed objective medical testing results and concluded Plaintiff had scarring at the C6-C7 level, worsening disc bulging and significant degeneration at and above the site of fusion. (R. at 127). On both May 18 and 24 of 2004, Dr. Bookwalter also concluded that imaging studies of Plaintiff's spine showed degeneration at and around Plaintiff's fusion site. (R. at 176, 622). Dr. Bookwalter believed that there was no surgical intervention that could provide Plaintiff with pain relief, and recommended that Plaintiff remain on total temporary disability. (R. at 622). Both of these doctors noted disc bulging and herniations in Plaintiff's spinal imaging. Dr. Munirji also noted disc protrusion in May of 2004. (R. at 626-27).

Further, while the early EMG nerve conduction studies conducted by Dr. Munirji had yielded normal results, he made it clear in two separate reports - on July 28, 2003, and May 18, 2004 - that because such testing cannot measure the smallest nerve fibers conveying pain, it was quite possible that radiculopathy, myofascial pain syndrome, and other causes of pain and numbness existed. (R. at 624, 648). The subsequent CT myelogram as reviewed by Dr. Tung showed scarring at the C6-C7 level of Plaintiff's spine, worsening disc bulging at the C4-C5 level, and multi-level degenerative changes, thereby identifying objective medical bases for plaintiff's pain and adding further support for Dr. Munirji's assessment.

Moreover, even when Dr. Munirji released Plaintiff for light duty work on July 28, 2003, Plaintiff's limitations were fairly substantial: one to four hours standing/walking; three to five hours sitting; and, no lifting over fourteen pounds. (R. at 221). By April of 2004, however, Dr. Munirji determined that plaintiff was enduring severe pain and was in need of further evaluation and treatment. By May of 2004, Dr. Munirji had observed new disc protrusion and by June of 2004 he was of the opinion that plaintiff's cervical impairment had deteriorated to the point that

26

rendered plaintiff totally disabled, an assessment in which Dr. Brookwalter concurred.

These assessments by the treating and consulting physicians acknowledge the progression of a cervical impairment that deteriorated with the passage of time and became non-responsive to treatment. Plaintiff ultimately was diagnosed as suffering from chronic cervical and left upper extremity pain, disc herniation, cervical radiculopathy, myofascial syndrome, and meralgia paresthetica. The early reports and snapshot assessments of Dr. Kasdan did not provide a proper basis to ignore the import of this substantial body of evidence. Consequently, the ALJ erred in his wholesale discounting of it. *See Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (A single piece of evidence is not substantial where it is overwhelmed by other evidence or if it is not evidence but mere conclusion.); *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record.").

With respect to Plaintiff's mental limitations, the ALJ relied heavily upon Dr. Bernstein's September 30, 2005, examination and report regarding Plaintiff's psychological condition. (R. at 14, 710-11). Dr. Bernstein's prognosis for Plaintiff was 'fair,' and he noted only slight to moderate limitations in functioning. (R. at 19-20, 692-93). Yet what Dr. Bernstein could not consider at the time of his reports, and what the ALJ only summarily discussed, was that Plaintiff's mental health began to further deteriorate and subsequently included at least three decompensation events – June 2, 2006, June 26, 2006, and July 9, 2006. In July of 2005, Plaintiff was admitted to Butler Memorial Hospital for detox and substance abuse issues. It was noted at that time that plaintiff had a history of depression beginning at the age of sixteen.

In 2006, Plaintiff was admitted to the psychiatric unit of Forbes Regional Hospital on three occasions because of suicidal ideation and attempted suicide. Plaintiff received less than 'fair' prognoses in behavioral health assessments following his June 26 and July 9 admissions to Forbes Regional Hospital. These assessments were the most recent analyses of Plaintiff's mental health, and during his July 9 admission Plaintiff was diagnosed with bipolar disorder and recurrent major depression with severe psychotic features. (R. at 721-31). Plaintiff also was

assessed a GAF score of 20[19] at both admissions (R. at 721-31). Despite the recency of these behavioral assessments, the ALJ failed to discuss this obviously probative evidence in any meaningful way. Had the ALJ done so, the earlier impressions of Plaintiff's overall mental picture necessarily would have been significantly diminished in assessing plaintiff's current and overall mental health.

When viewed as a whole, Plaintiff's mental profile reflects a long downward spiral precipitated by severe, largely intractable and un-treatable neck pain, followed by addiction to prescribed medication and marital/ familial discord. As was evident in the record, Plaintiff saw Dr. Diliscia for psychological treatment consistently while seeing Dr. Hsu for physical rehabilitation. Plaintiff later sought psychological treatment from Dr. Fedder and Dr. Rechter. Unfortunately, as time progressed and Plaintiff's symptoms worsened, he had difficulty obtaining treatment because of insurance coverage. (R. at 17, 796).

From the repeated hospital admissions and indications of suicidal ideation, it is clear that plaintiff suffered a significant decline in mental health. He was diagnosed with bipolar and recurrent major depressive disorder. He repeatedly received GAF scores that unequivocally reflected a level of functioning far below the minimum needed to maintain substantial gainful activity for 40 hours a week, 52 weeks a year.

The sad irony in the present case is that Plaintiff must endure a situation wherein the only relief from his neck pain is provided by pain medication. But if he takes the medication, he risks relapse into dependency, abuse, and further psychological deterioration, and so must avoid it. As he reported at the hearing, he now only takes Motrin for pain. (R. at 795). He has diagnoses of bipolar and major depressive disorders. He has no ongoing access to mental health services because of a lack of insurance. (R. at 796). This aspect of the record hardly provides substantial evidence to support a finding that plaintiff can meet even the minimal mental components of the residual functional capacity assessment used by the ALJ to deny plaintiff's application.

---

[19]

See Footnote 15, *supra* at 12.

The ALJ also erred in his assessment of Plaintiff's testimony concerning the limitations produced by his physical and mental impairments. The Act recognizes that under certain circumstances the subjective reporting of limitations may in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall alone not be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that result from anatomical, physiological or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984). The United States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district courts when reviewing assessments of the Commissioner based on subjective reports of significant limitations: (1) subjective complaints are to be seriously considered, even where not fully confirmed by objective medical evidence; (2) subjective complaints may support a claim for disability benefits and may be disabling; (3) when such complaints are supported by medical evidence, they should be given great weight; and finally, (4) where the claimant's testimony about the reported limitation is reasonably supported by medical evidence, the ALJ may not discount the limitation without contrary medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31 (3d Cir. 1985).

In evaluating such limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports, in that he must weigh all the evidence before him and explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical

evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)). An ALJ also must give a claimant's subjective description of his or her inability to perform light or sedentary work serious consideration when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999).

Plaintiff testified that as a result of the combined effects of his impairments he isolates himself during the day, and is limited in performing even simple everyday activities because his pain keeps him off task, mentally, and is debilitating, physically. (R. at 799-807). The severity of Plaintiff's conditions clearly supports his subjective complaints. Three treating physicians found Plaintiff's pain from two failed surgeries and a deteriorating cervical spine to be so severe that he was unable to work. They continued to prescribe addictive pain medication even after plaintiff's issues with dependency had surfaced, and thus did not doubt the severity of the pain produced by plaintiff's cervical impairment. Recent behavioral assessments completed by the hospital where Plaintiff was admitted three times for suicidal ideation and attempted suicide painted a dark psychological picture. Beyond relying on a one-time consultation conducted in an earlier time frame, the ALJ provided virtually nothing to refute this evidence or Plaintiff's subjective claims regarding pain and functional limitations.

The record when viewed as a whole indicates that Plaintiff suffered from physical and mental health impairments which progressively deteriorated with the passage of time. By June of 2004 Plaintiff was suffering from a cervical impairment that had worsened to the point that three treating/consulting physicians believed that Plaintiff was precluded from substantial gainful

activity. By the summer of 2006, Plaintiff's mental health had deteriorated to the point where he had repeated suicidal ideation, attempted to commit suicide, and was diagnosed with two major mental health disorders. His level of functioning was assessed by the examining physicians as being far below even the lowest level that would permit an individual to work on a consistent and ongoing basis.

It follows that Plaintiff's claimed need to minimize his physical activities due to the onset of pain, his periodic need lay down during the day due to pain, and his inability to cope with his pain psychologically, find objective support in the medical record. These claimed limitations find more than ample support in the medical evidence, particularly as it relates to the later period of time under consideration by the ALJ. Because there were medical bases for Plaintiff's complaints and the treating sources did not doubt the existence of Plaintiff's pain, the ALJ erred in failing to accord proper weight to this aspect of the record. *See Stewart v. Sullivan*, 881 F.2d 740 (9th Cir. 1989) (it is error to reject consistent evidence of excess pain on the ground that it is not supported by objective medical findings where there is medical evidence to support the existence of some pain); *Ferguson v. Schweiker*, 765 F.2d 31 (3d Cir. 1985) (where claimant's testimony as to pain reasonably is supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence; and where the complaints are supported by medical evidence, they are to be given great weight).

Moreover, as explained by the vocational expert, these limitations preclude substantial gainful activity because an individual would not be able to stay on task for the requisite portions of each day. (R. at 810). There was no probative medical or other evidence advanced by the ALJ that undermined or countered the claimed impact of Plaintiff's impairments and the resulting limitations as they existed by the summer of 2006. While Plaintiff may not have been disabled from the date claimed, it is clear that by the time he reached his maximum medical recovery without substantial improvement, and had experienced a significant decline in mental health, he was disabled. As such, the court is compelled to find in favor of the Plaintiff in light of the overwhelming weight of the evidence supporting his claim.

## VI.  CONCLUSION

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or can be expected to last for a continuous period of at least twelve months.  The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week.  *Dobrowolsky v. Califano*, 606 F.2d 403, 408 (3d Cir. 1979).  The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis.  Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act.  *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a).  This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity.  *Rossi v. Califano*, 602 F.2d 55 (3d Cir. 1979).  Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of May 12, 2006, when Dr. Hsu indicated that the limitations from Plaintiff's progressively deteriorating impairments had become permanent and prevented him from meeting the demands of substantial gainful activity on a regular and sustained basis.  This assessment was further augmented by the records reflecting the deterioration of Plaintiff's mental health during summer of 2006. Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence.  As a result, Plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the

Commissioner with direction to grant benefits consistent with an onset date of May 12, 2006.

An appropriate order will follow.


Date: December 23, 2010

                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge



cc:     Jeffrey A. Pribanic, Esq.

        Christy Wiegand, AUSA

        Via: CM/ECF Electronic Filing